IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| OVERLAP, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 07-0161-CV-W-ODS |
| ) | |
| ALLIANCE BERNSTEIN ) | |
| INVESTMENTS, ) | |
| ) | |
| Defendant. ) | |

ORDER AND OPINION GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO DISMISS

Pending is Defendant's Motion to Dismiss, which targets parts of Counts I, II and IV and all of Counts III, V and VI. For the following reasons, the motion (Doc. # 13) is granted in part and denied in part.

I. BACKGROUND

The First Amended Complaint[1] alleges Plaintiff created, developed, and distributed software that is used to compare the holdings of various mutual funds. The software compares the stocks held in two or more mutual funds to ascertain the stocks held in common (i.e., the "overlap") between those funds. This allows investors more complete information about their investments.

Plaintiff does not sell its software; instead, it licenses it. "The License Agreement . . . displays on the computer screen prior to the first use of the software. A user of the Overlap software cannot begin using the software without first reading the License Agreement. The user must click a button on the computer screen acknowledging that

---

[1]The Court's discussion will focus on the Amended Complaint even though it was filed after Defendant's motion was filed.

he or she has read the License Agreement and agrees to its terms, before using the software." Amended Complaint, ¶ 12. Two different license agreements were utilized during the time period relevant to this suit, but the Amended Complaint does not indicate when the usage of one stopped and the other began. The entirety of the first license read as follows:

> This version of Overlap is licensed in a single use only environment. To obtain licensing for multiple use environments, including networks and multiple installations, call 1 800 OVERLAP.

The second version of the license is lengthier. It advises the prospective licensee that he/she/it "may install and use one copy of the product on a single computer. This copy is to be used by only a single user and will be used to the benefit of said single user. If you wish to use the product for more users you will need an additional license for each user." Elsewhere, the license advises the prospective licensee may not "[u]se the product for the benefit of more than one licensed user." The terms "user" and "benefit" are not defined.

In September 2000, Plaintiff's President (Kevin Fryer) discussed the uses permitted under the license with one of Defendant's employees (Jennifer Levy). Fryer explained "that the terms of the license prohibited the use of the software for unlicensed personnel and that, in particular, providing Overlap analysis to unlicensed brokers was outside the scope of the license. Ms. Levy stated that [Defendant] was not using the Overlap software as Mr. Fryer described and that the license holders . . . would use the Overlap software for internal research only." Amended Complaint, ¶ 24.

Prior to 2003, Defendant "purchased between 2,400 and 4,000 Overlap software licenses per year, providing some of those licenses to its employees and some to outside financial analysts." Amended Complaint, ¶ 22. "In addition . . . . [Defendant] provided Overlap analysis to unlicensed personnel who contacted [its] sales help desk." Amended Complaint, ¶ 23. In October 2003, Defendant "requested to purchase only 200 Overlap software licenses. Of those 200 licenses, 43 were for [Defendant's] employees." Amended Complaint, ¶ 26. On October 29, Fryer contacted a representative of Defendant's and indicated his belief Defendant had been "conducting

2

Overlap analysis and running Overlap reports for brokers, financial analysts, or others who were not licensed to use or benefit from the use of Overlap software." Amended Complaint, ¶ 28. Defendant could not confirm this was happening and indicated it no longer wished to use Plaintiff's product; the licenses expired in mid-January 2004. Amended Complaint, ¶ 30.

The day after the licenses expired, another of Defendant's representatives contacted Plaintiff to discuss the purchase of 130 licenses. Fryer told this representative that Defendant "was not permitted to provide Overlap analysis to unlicensed personnel." Defendant's representative confirmed this understanding, indicated this had not occurred in the past, but "would not confirm in writing that [Defendant's] past practices had complied with the license or that [Defendant] would change its practices going forward." Amended Complaint, ¶¶ 31-33. Plaintiff declined to renew any of Defendant's licenses. Amended Complaint, ¶ 34.

With this general background in place, Plaintiff alleges additional facts within each of the six claims it has raised:

- Count I asserts a claim for breach of the license agreement and alleges Defendant breached the license "by loading a single copy of the Overlap software on multiple computers and/or using a single copy of the Overlap software for the benefit of multiple users." Amended Complaint, ¶ 40.

- Count II asserts a claim for unfair competition. Augmenting this claim are Plaintiff's contentions that Defendant (1) produced "Overlap reports to persons who were not licensed to use or benefit from the Overlap software" that bore Plaintiff's name, (2) reproduced the computer program, and (3) used Plaintiff's name in connection with the sale and advertising of Defendant's services. Amended Complaint, ¶ 43.

- Count III asserts Defendant infringed Plaintiff's copyright by (1) reproducing the reports generated by the computer program and (2) using a single disk to install the program on multiple computers. Amended Complaint, ¶¶ 51-52.

3

- Count IV asserts Defendant infringed Plaintiff's trademarks by using Plaintiff's trademarked name on reports, some of which were generated by the software and some of which were not. Amended Complaint, ¶¶ 59-61.
- Count V asserts a claim for fraud predicated on Jennifer Levy's representations in September 2000 that Defendant was "not disseminating Overlap analysis to unlicensed financial analysts and . . . was using the Overlap software for internal research purposes only . . . ." Amended Complaint, ¶ 66.
- Count VI asserts a claim for negligent misrepresentation based on the September 2000 conversation between Levy and Fryer.

## II. DISCUSSION

A motion to dismiss for failure to state a claim should be granted when it appears that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Davis v. Hall, 992 F.2d 151, 152 (8th Cir. 1993) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). In ruling on a motion to dismiss, the Court is required to view the facts alleged in the Amended Complaint in the light most favorable to the Plaintiff. The Court is limited to a review of the Amended Complaint; the only items outside the Amended Complaint that may be considered without converting the motion to one seeking relief pursuant to Rule 56 of the Federal Rules of Civil Procedure are (1) exhibits attached to the Amended Complaint, and (2) materials necessarily embraced by the Amended Complaint. Mattes v. ABC Plastics, Inc., 323 F.3d 695, 698 (8th Cir. 2003). In this case, the licenses were both referenced in and attached to the Amended Complaint.

### A. Breach of License

Defendant does not contest the legal viability of Count I insofar as it alleges Defendant breached the license by installing a single copy of the software on multiple computers. Instead, Defendant challenges the legal viability of Count I insofar as it

4

alleges Defendant breached the license by "using a single copy of the Overlap software for the benefit of multiple users."

Count I does not specify the manner in which Defendant allegedly used a single copy of the program for the "benefit of multiple users." Defendant theorizes, and Plaintiff does not dispute, that Plaintiff is alleging Defendant breached the license when a licensed user generated a report and gave it to an unlicensed user. Defendant contends such an allegation fails to state a claim because the license does not prohibit such use.

Neither version of the license is sufficiently specific to allow the Court to conclude as a matter of law whether and how the use of the software's outputs was limited. The first version of the license says the program can be used only in a "single use environment" but does not define the term. The second version of the license says the program may be used by and for the benefit of a single user, but does not specify whether the user is Defendant or the employee who loads the software onto the computer and actually clicks on the license. It is also unclear what the license means when it purports to limit use of the computer program's "benefit."[2] The phrase limiting the program's use "to the benefit of [a] single user" can be interpreted to limit the use of reports generated by the program. Whether that is the interpretation agreed to by the parties is a matter for another day. For present purposes, it is sufficient for the Court to observe this aspect of Count I states a legally viable claim.

---

[2]Read literally, a restriction preventing the software's use for anyone else's benefit would prohibit its use to analyze customer portfolios. In fact, a broker could not even used the software to formulate advice for an unlicensed customer because such "use" would "benefit" an unlicensed party. This appears to be an absurd result, given that the software's purpose is to enable brokers to benefit investors. There is also no suggestion that Defendant's customers are "users," such that a license must be obtained for any customer whose portfolio will be analyzed with the software, or for any customer with whom Defendant's brokers discuss the results generated by the software. However, Plaintiff's interpretation of its license appears to lead to these absurd ends.

5

B.  Unfair Competition and Trademark Infringment

As with Count I, Defendant seeks dismissal of Counts II and IV to the extent they are predicated on the dissemination of reports generated by the program.  Both claims require proof that the defendant's actions are likely to cause consumer confusion.  E.g., Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999); Cornucopia, Inc. v. Wagman, 710 S.W.2d 882, 888 (Mo. Ct. App. 1986).

Defendant argues[3] these claims must be dismissed to the extent they allege liability for distributing documents actually generated by the program because those documents were genuinely Plaintiff's product and the trademark was properly affixed to them.  However, infringement can occur if the defendant's actions are "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person . . . ."  15 U.S.C. § 1125(a)(1)(A).  "The unauthorized use of a trademark which has the effect of misleading the public to believe that the user is sponsored or approved by the registrant can constitute infringement."  Burger King Corp. v. Mason, 7120 F.2d 1480, 1492 (11th Cir. 1983), cert. denied, 465 U.S. 1102 (1984); see also Siegerist v. Blaw-Knox Co., 414 F.2d 375, 380 (8th Cir. 1969).  Defendant contends these cases are distinguishable in that they involved situations in which a once-valid license was terminated.  For instance, in Mason the defendant continued using the franchisor's name, logo and other marks after the franchise was terminated, thereby creating the false impression that the restaurant was still affiliated with Burger King.  However, this is not the only way the public can be misled about sponsorship or approval; the defendant would have violated this provision if it used the name, logo and other marks even without a prior licensing arrangement.  In such a situation, the potential for customer confusion is nearly the same.

---

[3]Defendant also contends that "[d]issemination of the Software output . . . cannot support a claim for trademark infringement because any such action on the part of [Defendant] was as an authorized licensee of Plaintiff and thus would not lead to consumer confusion."  Defendant's Suggestions at 10.  Having held Plaintiff is entitled to pursue its claim that dissemination of the output violated the license, the Court is constrained to reject Defendant's argument in this context as well.

6

The Court harbors serious doubts as to whether any consumers were confused into believing there was a sponsorship or approval within the meaning of the statute. The theory seems most applicable to a situation in which a defendant "pretends" to be related to the mark's owner. In this case, the use of genuine documents seems unlikely to engender the necessary confusion. Plaintiff insists Defendant's distribution of genuine documents implies permission to distribute the documents, and this is the relationship Defendant falsely implied. Plaintiff's claim appears to be nothing more than a repackaged version of the breach of lease claim. Nonetheless, despite these misgivings, the Court cannot conclude the claim is not legally viable.

### C. Copyright Infringement

In its initial Complaint, Plaintiff failed to allege it owned any copyrights. The Amended Complaint (which, as noted, was filed after the Motion to Dismiss was filed) does allege ownership of a copyright in the computer program. Therefore, Count III survives to the extent it alleges Defendant copied the computer program. However, there is no claim of a copyright on the reports generated by the program, so Count III is dismissed to the extent Plaintiff asserts Defendant infringed its copyright by distributing computer-generated reports.

### D. Fraud and Negligent Misrepresentation

The elements of fraudulent misrepresentation are: "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of the falsity or his ignorance of the truth; (5) the speaker's intent that his representation be acted upon; (6) the hearer's ignorance of the falsity; (7) his reliance on the truth of the representation; (8) the hearer's right to rely on the representation; and (9) the hearer's subsequent and proximate injury." Bank of Kirskville v. Small, 742 S.W.2d 127, 131 (Mo. 1987) (en banc). "The elements of negligent misrepresentation differ from those of fraudulent misrepresentation in one major respect: while the later requires proof that the defendant

7

Case 4:07-cv-00161-ODS   Document 33   Filed 12/14/07   Page 7 of 9

knew the statement was untrue or was reckless as to whether the statements were true or false, the former merely requires proof that the defendant failed to exercise reasonable care or competence to obtain or communicate true information." Springdale Gardens, Inc. v. Countryland Dev., Inc., 636 S.W.2d 813, 816 (Mo. Ct. App. 1982); see also O'Connell v. Schoot Dist. of Springfield R-12, 830 S.W.2d 410, 417 (Mo. 1992) (en banc).

Defendant contends Plaintiff did not plead fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. "Rule 9(b) is to be read in the context of the general principles of the Federal Rules, the purpose of which is to simplify pleading. Thus, the particularity required by Rule 9(b) is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations." United States ex rel. Costner v. United States, 317 F.3d 883, 888 (8th Cir.), cert. denied, 540 U.S. 875 (2003); see also Roberts v. Francis, 128 F.3d 647, 651 & n.5 (8th Cir. 1997). It is not clear whether Defendant has withdrawn this point in light of the Amended Complaint, but it does not matter because the Court holds the Amended Complaint satisfies Rule 9(b).

Defendant next argues the representations were not material, not reasonably relied upon, and could not have damaged Plaintiff. The Court tends to agree with respect to the statements made in 2004 and late 2003 because Plaintiff does not suggest that it relied on those statements to its detriment. However, Levy's statements in February 2000 – depending upon the evidence – could satisfy the elements of the fraud and negligent misrepresentation claims. The Court harbors some skepticism about the existence, extent and reasonableness of Plaintiff's reliance, but this is not a matter that can be addressed in a 12(b)(6) ruling.

Finally, Defendant argues no false statements were made because its actions did not violate the license. Defendant concedes this argument requires the Court to conclude the license did not prohibit Defendant's actions, and the Court has already expressed its inability to make this finding.

8

## III. CONCLUSION

For these reasons, the Motion to Dismiss is granted to the extent Plaintiff asserts a claim for copyright infringement arising from Defendant's distribution of reports generated by the software. The motion is denied in all other respects.

IT IS SO ORDERED.

                                              /s/ Ortrie D. Smith
                                              ORTRIE D. SMITH, JUDGE
DATE: December 14, 2007                UNITED STATES DISTRICT COURT