UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| **Overlap, Inc.,**<br><br>      **Plaintiff,**<br><br>  vs.<br><br>**AllianceBernstein Investments, Inc.**<br><br>**(f/k/a AllianceBernstein Investment Research and Management, Inc., and f/k/a Alliance Fund Distributors, Inc.)**<br><br>      **Defendant.** | 07-0161-CV-W-ODS |

**FIRST AMENDED COMPLAINT**
**(REVISED PURSUANT TO DOC. 33)**

Overlap, Inc., for its First Amended Complaint against Defendant AllianceBernstein Investments, Inc. (formerly known as AllianceBernstein Investment Research and Management, Inc. and Alliance Fund Distributors, Inc.) ("Alliance" or "Defendant"), states:

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiff Overlap, Inc. ("Overlap") is a Kansas corporation. Overlap at all times relevant hereto maintained its principal place of business at 112 West 9th Street in Kansas City, Missouri.

2. Defendant AllianceBernstein Investments, Inc. is Delaware corporation, with its principal place of business in New York, N.Y. Alliance at all times relevant hereto transacted significant business in Missouri. Alliance's registered agent for the service of process is C.T. Corporation, 120 South Central Avenue, Clayton, MO 63105.

3. This Court has jurisdiction over each Defendant pursuant to 28 U.S.C. § 1332

because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interests and costs, exceeds $75,000. This Court has further jurisdiction over the federal claims alleged pursuant to 28 U.S.C. §§ 1331 and 1338. Venue is proper pursuant to 28 U.S.C. §§ 1391, 1441.

## **OVERLAP'S SOFTWARE AND ITS LICENSE AGREEMENT**

4. Plaintiff Overlap creates, develops, distributes and licenses a software product that analyzes the stock portfolio of mutual fund companies.

5. Mutual fund companies own the stock of numerous publicly traded companies. An individual, as well as many types of legal entities, can buy shares of a mutual fund. The value of mutual fund shares depends on the value of the stock portfolios held by that mutual fund.

6. Some investors own shares in two or more mutual funds and want to know whether the stock portfolios of the two or more mutual funds "overlap", that is, contain the same stocks.

7. An investor potentially faces a greater risk of loss if he or she owns shares of mutual funds that overlap to any significant extent.

8. A stockbroker, by using the Overlap software Plaintiff developed, can compare the stock portfolios held by two or more mutual funds to determine how much these portfolios overlap and can thereby advise his or her client about how much risk they are taking by owning the shares of various mutual funds.

9. It is customary in the software industry to "license" copies of software rather than "sell" copies. A "license" is an agreement that gives the licensee the right to use the software,

but requires compliance with the terms of the agreement. Overlap, Inc. does not sell copies of its software, but instead licenses its software to those who purchase it for a fee of $165 per license.

10. Plaintiff Overlap, Inc. has been licensing its Overlap software since the company was formed in 1995 and has licensed thousands of copies of its software to brokerage houses.

11. Unfortunately, Defendant has misappropriated the use of the Overlap software, as detailed below, by licensing a number of copies and then using them in violation of the software license agreement. In doing so, Defendant also repeatedly displayed a counterfeit "Overlap" trademark on computer screens and on financial reports they distributed to their associates and/or customers.

12. A Software License Agreement (the "License Agreement") is included with the software when it is sold. The License Agreement also displays on the computer screen prior to the first use of the software. A user of the Overlap software cannot begin using the software without first reading the License Agreement. The user must click a button on the computer screen acknowledging that he or she has read the License Agreement and agrees to its terms, before using the software. Requiring the user to view the License Agreement and then click an acknowledgment button on the computer screen is commonly referred to as a "click wrap" license agreement. Each copy of the Overlap software sold by Plaintiff to Defendant had the "click wrap" License Agreement built into it.

13. Depending upon the specific version of Overlap and the date of use, Defendant agreed to one of the two versions of License Agreement attached hereto as Exhibits 1 and 2 and incorporated by reference herein. Both License Agreements limit the use of the software to a single user.

14. Overlap, Inc. uses the word "Overlap" to identify the computer software it

licenses, as well as the paper reports generated by that computer software, and to distinguish its software and its reports from other goods of this type made or sold by others.

15. Overlap, Inc. registered its trademark "Overlap" with the United States Patent and Trademark Office on March 12, 1996.

16. Overlap, Inc. has registered its trademark "Overlap" with the State of Missouri, pursuant to R. S. Mo. 417.016.

17. The computer discs used by Overlap, Inc. to distribute its software bear its trademark "Overlap".

18. Whenever the Overlap software is used on a computer, the software displays the trademark "Overlap" on the computer screen and all written reports produced by the Overlap software bear the trademark "Overlap."

19. Overlap registered a copyright with respect to the Overlap software with the United States Copyright Office on March 12, 2002.

**DEFENDANT'S VIOLATIONS OF OVERLAP'S SOFTWARE LICENSES**

20. Alliance began purchasing Overlap licenses in 1997. Between 1997 and 2003, it purchased an increasing number of licenses in its New York office, eventually purchasing nearly 4,000 licenses annually.

21. Beginning in 1998, Alliance also purchased Overlap licenses for personnel in its office in Secaucus, New Jersey. From September 2000 until early 2004, Alliance purchased 130 licenses annually for personnel in its Secaucus office.

22. Prior to 2003, Alliance purchased between 2,400 and 4,000 Overlap software licenses per year, providing some of those license to its employees and some to outside financial analysts.

23. In addition to providing Overlap licenses to certain employees and outside

financial analysts, Alliance provided Overlap analysis to unlicensed personnel who contacted Alliance's sales help desk.

24. In September 2000, when Alliance increased the number of licenses it purchased for its Secaucus office, Overlap President Kevin Fryer explained to Alliance employee Jennifer Levy that the terms of the license prohibited the use of the software for unlicensed personnel and that, in particular, providing Overlap analysis to unlicensed brokers was outside the scope of the license. Ms. Levy stated that Alliance was not using the Overlap software as Mr. Fryer described and that the license holders in the Secaucus office would use the Overlap software for internal research purposes only.

25. In fact, unbeknownst to Overlap until the fall of 2003, Overlap users in the Secaucus office functioned as a sales help desk, and Alliance personnel in that office ran Overlap reports for any broker, licensed or not, who requested one.

26. In October 2003, Alliance requested to purchase only 200 Overlap software licenses. Of those 200 licenses, 43 were for Alliance employees.

27. In October 2003, Overlap learned through an email from Alliance employee Scott Proctor that Alliance was using the Overlap software to run Overlap reports for any broker who requested one.

28. On October 29, 2003, Overlap President Kevin Fryer contacted Alliance representative Stephanie Seminara regarding Alliance's use of the Overlap software. Mr. Fryer described to Ms. Seminara his belief, based on information obtained at that time, that of the 200 licenses Alliance sought to purchase from Overlap, many were to be for the continued use by internal employees who had been conducting Overlap analysis and running Overlap reports for brokers, financial analysts, or others who were not licensed to use or benefit from the use of the

Overlap software.

29. After speaking with Mr. Fryer, Ms. Seminara stated that she would immediately investigate Alliance's use of Overlap software.

30. On January 12, 2004, Mr. Fryer again contacted Ms. Seminara, who stated that she had no information about Alliance's use of the Overlap software, but that Alliance did not plan to use the Overlap software in 2004. Mr. Fryer stated that Alliance's licenses to use and benefit from the Overlap software would expire the next day.

31. The next day, January 13, 2004, another Alliance representative, Irfan Raja (who, on Overlap's information and belief, worked on Alliance's sales help desk) contacted Mr. Fryer to discuss Alliance's proposed renewal of 130 licenses with Overlap. Mr. Raja stated that his group at Alliance was separate from Ms. Seminara's group.

32. Mr. Fryer told Mr. Raja that, under the terms of the software license, Alliance was not permitted to provide Overlap analysis to unlicensed personnel. Mr. Raja stated that Alliance would abide by the license, but he would not confirm in writing that Alliance's past practices had complied with the license or that Alliance would change its practices going forward.

33. During the same conversation, Mr. Raja stated that Alliance had never run Overlap reports for financial analysts and had never emailed, faxed or otherwise distributed any Overlap reports to financial analysts. Mr. Raja also stated that Alliance ran Overlap reports only to evaluate which mutual funds to package together to ensure that Alliance did not package funds with similar holdings.

34. After January 2004, Overlap declined to renew any of Alliance's licenses.

35. On June 28, 2004, Mr. Fryer spoke with a potential customer, who had not previously been licensed to use or benefit form the Overlap software. The potential customer

indicated that he had previously received Overlap reports from Alliance, but that he was no longer receiving such reports.

37. In August 2004, Plaintiff demanded that Defendant cease and desist all conduct that violated the Overlap software license. Overlap has since contacted Alliance numerous times to obtain information about Alliance's use of the Overlap software, but Alliance has provided no further information to Overlap.

37. Overlap has since learned that additional persons not licensed to use or benefit from the Overlap software have received Overlap reports and analysis from Alliance.

## COUNT I

## BREACH OF LICENSE AGREEMENT

38. Plaintiff re-alleges each and every paragraph set forth above as if fully set forth herein.

39. Defendant entered into binding License Agreements with Overlap, Inc., as set forth above.

40. Defendant breached the "single computer - single user" provisions of the License Agreement by loading a single copy of the Overlap software on multiple computers and/or using a single copy of the Overlap software for the benefit of multiple users.

41. As a direct and proximate result of Defendant's breach of the Overlap License Agreements, Plaintiff Overlap, Inc. has suffered injury to its business and property in an amount greatly in excess of $25,000.00.

WHEREFORE, Plaintiff Overlap, Inc. requests judgment against Defendant in an amount in excess of $25,000.00, for prejudgment and postjudgment interest, and for its costs and disbursements of this action, together with such other relief as the Court deems just and equitable

in the circumstance.

## COUNT II

## UNFAIR COMPETITION

42. Plaintiff re-alleges each and every paragraph set forth above as if fully set forth herein.

43. In providing the Overlap software and in producing Overlap reports to persons who were not licensed to use or benefit from the Overlap software, Defendant used the trademark "Overlap, Inc." and "Overlap" without the consent of Overlap, Inc., reproduced the computer program "Overlap" without the consent of Overlap, Inc., and used the term "Overlap" in connection with the sale and advertising of Defendant's services in an effort to cause confusion, mistake, and deceive as to the source of origin of Defendant's goods and services.

44. Defendant reproduced, copied, and imitated the trademark "Overlap" and applied the reproductions, counterfeits, copies and imitations to Defendant's goods and services intended to be used upon and in conjunction with the sale and distribution of Defendant's goods and services. Defendant committed these acts with the intent to cause confusion, mistake, and deception.

45. Defendant's conduct constitutes unfair competition under R. S. Mo. § 417.056 and Missouri common law.

46. As a direct and proximate result of Defendant's actions, Plaintiff Overlap, Inc. has suffered and will in the future continue to suffer dilution of the distinctive quality of its mark and as a result Plaintiff Overlap, Inc. has suffered injury to its business and property greatly in excess of $25,000.00 and is also entitled to injunctive relief, as well as monetary damages in excess of $25,000.00.

47. Defendant's conduct in intentionally engaging in unfair competition as set forth above was caused by an evil motive and/or resulted from reckless indifference to the rights of Plaintiff.

WHEREFORE, Plaintiff Overlap, Inc. prays for judgment against Defendant permanently enjoining the use, display, and sale of goods or services incorporating counterfeit versions of the Overlap trademark and any colorable variation thereof; for damages in excess of $25,000.00, including but not limited to, all of Defendant's profits derived from, and all of Plaintiff's damages sustained by reason of, Defendant's wrongful copying, use, distribution, and display of Plaintiff's software; for punitive damages in an amount that is fair and reasonable, but will serve to deter others from like conduct in the future; for its costs and disbursements incurred in this action; for prejudgment and postjudgment interest; and for all other relief that this Court deems just and equitable in the circumstance.

## COUNT III

## COPYRIGHT INFRINGEMENT

48. Plaintiff re-alleges each and every paragraph set forth above as if fully set forth herein.

49. Overlap owns a copyright, which was registered in March 2002 with the United States Copyright Office.

50. Defendant has engaged in knowing, blatant and systematic theft of Plaintiff's copyrighted software program. By its actions, Defendant has committed willful copyright infringement in violation of Section 106 and Section 501 of the Copyright Act, 17 U.S.C. § 101 *et seq.*

51. For its own commercial benefit, Defendant knowingly, willfully and without

authorization infringed Plaintiff's copyright.

52. Defendant infringed this copyright by installing a single disk of the Overlap software on multiple computers, thereby providing unlicensed individuals access to the Overlap software.

53. Defendant's actions were malicious, deliberate and willful.

54. Plaintiff has suffered actual damages and has lost profits due to Defendant's infringement of Plaintiff's copyrighted works.

55. Defendant has unjustly profited by its infringement of Plaintiff's copyrighted works.

WHEREFORE, Plaintiff is entitled to the full range of copyright remedies, including an accounting for all of Defendant's ill-gotten profits, Plaintiff's actual damages, costs, lost profits, attorneys' fees and for all other relief that this Court deems just and equitable in the circumstance.

## COUNT IV

## TRADEMARK INFRINGEMENT

56. Plaintiff re-alleges each and every paragraph set forth above as if fully set forth herein.

57. Overlap, Inc. registered its trademark "Overlap" with the United States Patent and Trademark Office on March 12, 1996.

58. Defendant has engaged in knowing, blatant and systematic violation of Plaintiff's trademark. By its actions, Defendant has committed willful trademark infringement in violation of 15 U.S.C. § 1125(a).

59. Defendant reproduced, copied, and imitated the trademark "Overlap" and applied

the reproductions, counterfeits, copies and imitations to Defendant's goods and services intended to be used upon and in conjunction with the sale and/or distribution of Defendant's goods and services. Defendant committed these acts with the intent to cause confusion, mistake, and deception.

60. Specifically, Defendant used the trademark "Overlap" and "overlap" without the consent of Overlap, reproduced reports and documents bearing the "Overlap" trademark without the consent of Overlap, and used the term "Overlap" in connection with the sale, marketing and advertising of Defendant's goods and services.

61. Defendant also used the trademark "Overlap" in referring to information and reports that were not generated by the Overlap software. These reports contained different or misleading information not contained in reports generated by the Overlap software. Such use, among others, damaged Overlap's goodwill and decreased the value of the trademark.

62. Defendant's actions were malicious, deliberate and willful.

63. As a direct and proximate result of Defendant's actions, Plaintiff Overlap has suffered and will in the future continue to suffer dilution of the distinctive quality of its mark and as a result Plaintiff Overlap has suffered injury to its business and property. Overlap is entitled to injunctive relief as well as monetary damages.

WHEREFORE, Plaintiff prays for judgment against Defendant permanently enjoining the use, display, and sale of goods or services incorporating versions of the Overlap trademark and any colorable variation thereof. Plaintiff further prays for actual damages, including but not limited to all of Defendant's profits derived from its violation of Plaintiff's trademark and all of Plaintiff's damages sustained by reason of Defendant's wrongful copying, use, distribution, and display of Plaintiff's trademark. Plaintiff further prays for punitive damages in an amount that is

fair and reasonable, but will serve to deter others from like conduct in the future; for its costs and disbursements incurred in this action; attorneys' fees; and for all other relief that this Court deems just and equitable in the circumstance.

## COUNT V

## FRAUD

64. Plaintiff re-alleges each and every paragraph set forth above as if fully set forth herein.

65. Defendant knew that the Overlap License was for a single user and for the sole benefit of that single user.

66. Defendant represented to Plaintiff in September 2000, through employee Jennifer Levy, that Alliance was not disseminating Overlap analysis to unlicensed financial analysts and that Alliance was using the Overlap software for internal research purposes only at Alliance's Secaucus, New Jersey office.

67. Defendant represented to Plaintiff, through employees Jennifer Levy and Irfan Raja, that Alliance was *not* providing Overlap analyses to unlicensed users.

68. Plaintiff, through Kevin Fryer, expressly informed Alliance that it would have to pay licensing fees for *each* person who would benefit from the license, including all persons who would or could receive Overlap analysis. Relying on Alliance's representation that it was not providing Overlap analysis to unlicensed personnel or representatives, Plaintiff continued to license the Overlap software to Alliance.

69. Alliance continued to provide Overlap analysis to unlicensed personnel or representatives after Kevin Fryer informed Alliance that it must pay licensing fees for each person who would benefit form the license.

70. When Alliance represented to Kevin Fryer that it was not providing Overlap analysis to unlicensed personnel or representatives, and that it was using the Overlap software for internal research purposes only at its Secaucus, New Jersey office, Alliance knew those representations were false or was ignorant of the truth of those representations.

71. Alliance's misrepresentations were material.

72. The above-identified statements were false at the time they were made and induced Plaintiff to license and sell its software to Alliance and to continue to permit access to the software Alliance had already purchased.

73. Plaintiff did not know that Alliance's misrepresentations were false.

74. Plaintiff relied on Alliance's representations made in September 2000 and repeated in 2004, and Plaintiff continued to provide Alliance with access to the Overlap software through January 2004. Plaintiff would not have allowed such continued access or licensed its software to Alliance or continued to renew these licenses but for these false representations.

75. Plaintiff had a right to rely on Alliance's misrepresentations.

76. Alliance's fraudulent misrepresentations were caused by an evil motive and/or resulted from reckless indifference to the rights of Plaintiff.

77. As a direct and proximate result of Alliance's fraudulent conduct, Overlap has suffered damages.

WHEREFORE, Plaintiff Overlap prays for judgment against Defendant for damages; for punitive damages in an amount that is fair and reasonable, but will serve to deter others from like conduct in the future; for its costs and disbursements incurred in this action; for prejudgment and postjudgment interest, and for all other relief that this Court deems just and equitable in the circumstance.

## COUNT VI

## NEGLIGENT MISREPRESENTATION

78. Plaintiff re-alleges each and every paragraph set forth above as if fully set forth herein.

79. Defendant made or authorized false representations of fact, as described above, in the ordinary course of their business or because of a pecuniary interest on its part.

80. Defendant failed to exercise reasonable care or competence to determine whether the representations and information presented to Plaintiff were correct.

81. Defendant made these false representations intentionally for the guidance of Plaintiff in a particular business transaction with respect to the sale of software licenses. Plaintiff reasonably relied on Defendant's representations.

82. As a direct result of Plaintiff's reliance on Defendant's misrepresentations, Plaintiff suffered a pecuniary loss.

83. Defendant's conduct was outrageous because of Defendant's evil motives or reckless indifference to the rights of Plaintiff and therefore Plaintiff is entitled to punitive damages.

WHEREFORE, Plaintiff Overlap prays for judgment against Defendant for damages; for punitive damages in an amount that is fair and reasonable, but will serve to deter others from like conduct in the future; for its costs and disbursements incurred in this action; for prejudgment and postjudgment interest; and for all other relief that this Court deems just and equitable in the circumstance.

## JURY DEMAND

Plaintiff demands a jury trial on all issues triable to a jury.

Respectfully Submitted,

**STUEVE SIEGEL HANSON LLP**


_____/s/ Patrick J. Stueve_____
Patrick J. Stueve – Mo. Bar # 37682
stueve@stuevesiegel.com
Mark V. Dugan – Mo. Bar # 39639
dugan@stuevesiegel.com
Rachel E. Schwartz – Mo. Bar # 56241
schwartz@stuevesiegel.com
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101

**COUNSEL FOR PLAINTIFF OVERLAP, INC.**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies on the 21st day of December, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Kirsten A. Byrd
Blackwell Sanders Peper Martin LLP
4801 Main Street, Suite 1000
Kansas City, Missouri 64112
Ph: (816) 983-8000
Fax: (816) 983-8080

Jeffrey J. Kalinowski
Gary A. Pierson, II
Blackwell Sanders Peper Martin LLP
720 Olive Street, Suite 2400
St. Louis, MO 63101

**COUNSEL FOR DEFENDANT**

                                                    /s/ Patrick J. Stueve
                                                    Attorney for Plaintiff